# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| RYAN FINCHER, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 08-00148-CV-W-FJG |
| | ) |
| ST. PAUL FIRE & MARINE | ) |
| INSURANCE COMPANY, | ) |
| Defendant. | ) |

## ORDER

Pending before the Court are defendant's Motion for Summary Judgment (Doc. No. 32), plaintiff's Motion for Summary Judgment (Doc. No. 34), and defendant's Motion for Leave to File Supplemental Response to Order of March 3, 2009 (Doc. No. 54).

**I.     Background**

On May 29, 2006, Plaintiff Ryan M. Fincher was operating a motorcycle owned by the Unified Government of Wyandotte County when he collided with a vehicle driven by Carl Anderson ("Anderson"). Fincher filed suit in state court against Anderson for damages arising out of the collision, and the state court awarded plaintiff damages in the amount of $575,000. Anderson's automobile liability insurance covered only $50,000 for claims arising out of injury to one person, and that amount was paid to plaintiff in partial satisfaction of the judgment. At the time of the collision, Defendant St. Paul Fire & Marine Insurance Company provided automobile liability insurance coverage to the Unified Government of Wyandotte County/Kansas City, Kansas ("Unified Government"). Plaintiff notified defendant of the state court judgment, and defendant refused to pay the remaining judgment. (Pl.'s 2d Am. Pet., ¶ 13). Plaintiff then sued defendant for vexatious refusal to pay pursuant to Mo. Rev. Stat. § 375.420. (2d Am. Pet., ¶ 16).

The relevant automobile liability policy issued by defendant, identified as policy number GP06301520 ("2006 Policy"), was in effect from January 1, 2006 to January 1, 2007. The 2006 policy was a renewal of a 2005 policy issued by defendant, and both provided coverage for bodily injury liability for up to $500,000 per occurrence. Also, the policy lists a $50,000 limit for uninsured motorist coverage. Since its formation in 1997, the Unified Government's automobile insurance policies have always listed a $50,000 limit for uninsured motorist coverage.

In relation to the 2006 policy, David Coleman ("Coleman"), the risk manager for the Unified Government, signed a form entitled "Kansas Uninsured Motorists Coverage Excess Limit Rejection (Acknowledgment of Excess Coverage Rejection)" ("2006 rejection form"), which was dated on June 5, 2006. The rejection form reads in pertinent part:

> I acknowledge that I have been provided Uninsured/Underinsured Motorists Coverage and, in addition, I have been offered the following in accordance with the State law of Kansas,
>
> I. Single Limit Policies
>
>> I have been given the opportunity to purchase Uninsured/ Underinsured Motorists Coverage equal to my limit for bodily injury or death, and instead I select a lower limit of $50,000 [amount is handwritten]. (Note: Limit selected may not be less than $50,000 Single Limit.)

Under Kansas law, an insurer may not issue an automobile liability insurance policy unless it contains limits for uninsured motorist coverage in an amount equal to the limits of liability coverage for bodily injury or death. Kan. Stat. Ann. 40-284(a). Underinsured motorist coverage is included as a part of the uninsured motorist coverage required above. Kan. Stat. Ann. 40-284(b). Although the uninsured/underinsured motorist ("UM") coverage should equal the liability coverage for bodily injury and death in a policy, an insured may

2

reject, in writing, the amount of UM coverage in excess of that required under Kan. Stat. Ann. 40-3107, which in this case would be $50,000. Kan. Stat. Ann. 40-284(c). Once an insured rejects the excess coverage limit in writing, the rejection remains effective when a policy is renewed. Id.

As risk manager, Coleman is charged with finding insurance for the Unified Government, negotiating with insurance companies, and recommending to his supervisor, Harold Walker ("Walker"), which insurance the Unified Government should purchase. Beginning in 1989, Coleman was the risk manager for Kansas City, Kansas, and following the formation of the Unified Government in 1997, he continued in that position. From 1989 through 2006, Coleman signed rejection forms similar to the one he signed in 2006; however, in 2007 and 2008, the forms were signed by someone in the county administrator's office. Coleman believed he was authorized to sign the rejection forms because Walker, general counsel of the Unified Government and Coleman's supervisor, directed him to do so. Walker in turn stated that his authority to delegate that function was derived from the county administrator, who is responsible for running the day-to-day operations of the Unified Government. Both parties have moved for summary judgment.

II.     **Standard of Review**

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue

of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Because the facts are viewed in a light most favorable to the non-moving party, the court does not weigh evidence or assess a witness's credibility. Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004).

## III. Discussion

Both parties have moved for summary judgment, and though the parties attempt to dispute certain facts, there is not a genuine issue of material fact. Instead, the parties dispute the legal significance of particular actions and whether the Unified Government effectively rejected the excess limits for uninsured/underinsured motorist coverage. Both parties analyze the issues under Kansas law, and the Court shall do the same.

Plaintiff does not dispute the fact that the 2006 Policy states that the insured has a

4

$50,000 limit for uninsured coverage or that Coleman signed the 2006 rejection form. Rather, plaintiff's contention is that the rejection forms signed by Coleman are ineffective because the Unified Government charter authorizes only the mayor of the Unified Government to sign the rejection form.[1] Since the Mayor did not sign the rejection form, plaintiff argues that the rejection form signed by Coleman is ineffective under Kan. Stat. Ann. § 40-284(a)-(c).

Plaintiff also does not dispute the fact that if the rejection form was properly executed, then plaintiff cannot recover under the policy. Therefore, the coverage issue revolves around the 2006 rejection form, and the following issues need to be resolved: (1) whether the rejection form executed by Coleman is a contract or document that is required to be signed by the mayor, and (2) if so, whether Coleman had valid authority to sign the rejection form on behalf of the Unified Government.

### 1. Scope of the Charter's Signing Requirement

Plaintiff argues that the charter necessitates the mayor's signature on the rejection forms. However, the relevant language in the charter suggests that the appropriate signature, if any, would have to come from the county administrator, not the mayor. The applicable language in the charter, which is codified in the Code of the Unified Government of Wyandotte County, states in pertinent part that the "[t]he chief executive/mayor shall

---

[1] Plaintiff also contends that Kan. Stat. Ann. 12-10a06 demonstrates that the mayor is the only elected official with authority to enter into contracts. Further, plaintiff argues that even if the county administrator were authorized to sign, Kan. Stat. Ann. 19-3a04 would require that the county commissioners delegate such authority. These statutes address municipalities and counties respectively; however, the Unified Government is a distinct, hybrid form of government formed pursuant to Kan. Stat. Ann. § 12-340 et. seq. Thus, the Court finds that the Unified Government's Charter is the best source to determine the respective duties of the mayor and county administrator.

5

. . . [s]ign if authorized by the Commission and if necessary, all contracts and other documents of the Unified Government[.]" Unified Government Code, ch. 2, art. I, § 2-81 (13) (2008) (hereinafter referred to as the "Code"). However, the Code also states that the "county administrator shall . . . [s]ign all contracts, deeds, and other documents other than those authorized by the commission to be signed by the mayor or those which state or other law require the signature of the chief executive/mayor." Code, ch. 2, art. I, § 2-103(14). There is no evidence suggesting that the mayor was authorized by the commission to sign the rejection forms at issue. As noted above, contracts and documents that the commission does not authorize the mayor to sign shall be signed by the county administrator.

The next issue is whether the rejection form is the type of document that falls under the Code's signing requirement. Defendant argues that the rejection form is not a contract, in and of itself. See Nat'l Union Fire. Ins. Co. v. F.D.I.C., 957 P.2d 357, 363 (Kan. 1998) (stating that generally all types of insurance are unilateral contracts wherein after a premium is paid, the insurer is bound to provide coverage). Defendant argues that the insurance contract, including the UM coverage limit of $50,000, was entered into upon the Unified Government's submission of its application and payment of the premium, thus no signature was necessary to form the contract.

The Court agrees with defendant that the rejection form is not a contract in and of itself, but rather it is the insurance policy in its entirety, which represents the contract. At best, the 2006 rejection form is a confirmation regarding one of the terms of the contract, i.e. rejection of excess coverage. However, the Code also states that the county administrator shall sign "other documents." Neither the Code nor case law offer guidance

6

as to what "other documents" require the county administrator's signature, and whether the rejection form is such a document. The Court will assume, without deciding, that the writing required under Kan. Stat. Ann. 40-284(c) was a document that the county administrator had the duty to sign.

### 2. Coleman's Authority

Since it is undisputed that the county administrator did not sign the rejection forms, the Court must determine whether Coleman was authorized to sign the rejection. Defendant argues that the county administrator's duty to sign was delegable, and Walker, general counsel for the government, testified that he had been delegated the authority to sign all documents necessary to conduct the functions of his department from the county administrator. Walker in turn delegated such authority to Coleman, who was his subordinate. Plaintiff argues that the signature is not an act that can be delegated, and since the rejection form was executed without conforming to this requirement, plaintiff claims that the rejection form is invalid.

Contrary to plaintiff's position, the Unified Government Charter does not preclude the delegation of the county administrator's duty to sign documents to subordinates. Therefore, the Court must determine whether Coleman possessed valid authority to sign the rejection form as an agent of the Unified Government. "What constitutes an agency and whether there is any competent evidence that tends to prove the agency relationship is a question of law[.]" Town Center Shopping Center, LLC v. Premier Mortg. Funding, Inc., 148 P.3d 565, 569 (Kan. Ct. App. 2006). Actual authority may be given to an agent either expressly or impliedly. See In the Matter of Scholastic Book Clubs, Inc., 920 P.2d 947, 954 (Kan. 1996); Greep v. Burns, 159 P.2d 803, 808 (Kan. 1945).

7

While express authority typically involves an express statement by a principal to an agent, implied authority can be found by examining the circumstances of the case and the conduct and statements of the parties. Greep, 159 P.2d at 808. An employee may possess implied authority to bind his employer "where the course of dealings between the parties and the circumstances surrounding the case establish the employee's power to bind the employer." Beardsley v. Farmland Co-Op, Inc., 530 F.3d 1309, 1316 (10th Cir. 2008) (internal quotations omitted); see also Mohr v. State Bank of Stanley, 734 P.2d 1071, 1076 (Kan. 1987) (stating that an implied agency relationship is "readily inferable from a series of transaction") (internal quotations omitted). Further, "acquiescence in a series of acts is evidence of authority for the future only when the acts are of a like nature." Beardsley, 530 F.3d at 1316. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006).

In the present case, the Unified Government's manifestations to Coleman would lead him to reasonably believe that he was authorized to act on behalf of the Unified Government. Although the county administrator or the Unified Government never expressly stated that Coleman would be authorized to sign the rejection forms, the authority for his actions can be inferred from the circumstances. For example, as the risk manager since the government's formation in 1997, the government charged Coleman with selecting the appropriate insurance coverage for the the government and negotiating with insurance companies regarding various aspects of the insurance transaction. His decisions were subject to his supervisor's approval; however, his supervisor testified that Coleman was in

8

charge of determining the insurance needs for the government, procuring appropriate insurance coverage, and administering the insurance program. Since the government's formation, Coleman signed rejection forms similar to the 2006 rejection form, which confirmed the Unified Government's waiver of any excess UM coverage, and the government has carried the $50,000 UM coverage limit for its entire existence. As risk manager, Coleman could reasonably believe he was authorized to execute the rejection forms on behalf of the government as part of his general authority to procure insurance.

Coleman's authority may also be inferred from the course of dealings between the government and Coleman. For instance, after Coleman selected the automobile insurance policy for the year, both the mayor and county administrator would sign the check for the premium. Payment of the automobile insurance premium demonstrates both the mayor's and county administrator's acquiescence of Coleman's selection of a $50,000 UM coverage limit, and also his authority to execute the forms necessary to obtain such coverage. The Court finds that Coleman was authorized to sign the rejection form, and thus the rejection of excess UM coverage was valid.

Plaintiff's chief argument is that agency principles which apply to private entities are applied differently as they relate to public entities, such as the Unified Government. In fact, plaintiff acknowledges that defendant could potentially prevail in this matter if a public entity was not involved. To support its argument, plaintiff directs to the Court to the standard found in Blevins v. Bd. of County Comm'rs of County of Douglas, 834 P.2d 1344, 1351 (Kan. 1992), which states that a contract outside the scope of the government's power cannot be valid despite the government's good faith attempt to bind itself. Blevins also states that private parties act "at their own peril" when dealing with public entities and are

charged with knowing the extent of the entity's authority. Id. at 1352. By holding that Coleman was authorized to execute the rejection form, the Court does not contradict the holding in Blevins and other like cases. The cases plaintiff cites to all involve contracts that were outside the scope of the government's power to enter into; whereas, in the present case, there is no question that the Unified Government had the power to reject excess coverage. Instead, plaintiff disputes whether that power was properly executed. Blevins would apply if the Unified Government lacked the power entirely to reject excess coverage. That is not the case here, thus Blevins is inapposite.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** defendant's Motion for Summary Judgment (Doc. No. 32) and **DENIES** plaintiff's Motion for Summary Judgment (Doc. No. 34). Furthermore, the Court **DENIES AS MOOT** defendant's Motion for Leave to File Supplemental Response to Order of March 3, 2009 (Doc. No. 54).

**IT IS SO ORDERED.**

Date: 4/10/09
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
Chief United States District Judge